RUTH SCHUMACHER, Special Adm'r *ex rel.* Estate of Peter Bright-Asare, Plaintiff-Appellee and Cross-Appellant, v. CONTINENTAL AIR TRANSPORT COMPANY, INC., subsequently known as Parmelee Transportation Company, Defendant-Appellant and Cross-Appellee.

First District (2nd Division)   Nos. 1—89—0897, 1—89—1454 cons.

Opinion filed September 28, 1990.

James T. Ferrini, Richard R. Winter, and Edward M. Kay, all of Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago, for appellant, on appeal only.

William M. Stevens, Jill M. Rappis, and Rebecca Carlins, all of Rooks, Pitts & Poust, of Chicago, for appellee.

JUSTICE BILANDIC delivered the opinion of the court:

After a jury trial, judgment was entered in favor of plaintiff, Dr. Peter Bright-Asare, and against defendant, Continental Air Transport Company, Inc. Damages for plaintiff's personal injuries were assessed at $7,746,200. Defendant appealed. Plaintiff died on April 24, 1990, while this appeal was pending. On May 29, 1990, we entered an order substituting Ruth Schumacher, special administrator *ex rel.* estate of Dr. Peter Bright-Asare, as the party plaintiff.

Plaintiff alleged that defendant's notice of appeal was not timely and moved to dismiss this appeal. We denied plaintiff's motion. There-

after, plaintiff filed a cross-appeal challenging the jurisdiction of this court to consider defendant's appeal.

### PLAINTIFF'S CROSS-APPEAL

First we will consider the jurisdictional issue. Plaintiff contends that this court lacks jurisdiction to hear this appeal since the notice of appeal was not filed within 30 days from the entry of the judgment, or within 30 days from the trial court's ruling on a timely post-trial motion.

On December 14, 1988, the jury returned a verdict for plaintiff and the court entered judgment on that verdict. The judgment was entered in the trial court's minute book on that same day. The trial court did not require the parties to submit a written form of judgment order.

On December 15, 1988, plaintiff's counsel appeared *ex parte*, but with defense counsel's consent, and presented a written judgment order. The trial judge stated, "I don't need this." Plaintiff's counsel explained that he would like a written order for his file so the court directed the minute clerk to stamp the order. Plaintiff claims that the court directed the clerk to enter the order *nunc pro tunc* to December 14, 1988, and that since the clerk had already stamped the order December 15, the clerk changed the date on plaintiff's counsel's copy but not on the written judgment order filed with the court. The trial court's minute book for December 15 shows that the "case was disposed of 12/14/88." Nothing was said to indicate that this was intended to amend the judgment entered in the law record book.

Plaintiff concedes that if this court finds that the judgment was entered on December 15, then defendant's post-trial motion is timely. If this court finds that the judgment was entered on December 14, then defendant's post-trial motion was not timely. It is undisputed that the notice of appeal was filed within the statutory time following the disposition of the post-trial motion.

■ We find that plaintiff is estopped from denying that the written order is the judgment in this case and not merely superfluous. Plaintiff's counsel never told defense counsel that he was having the written order entered *nunc pro tunc* to December 14, 1988. Defense counsel believed that the written order would take the place of the December 14 entry and would constitute a judgment under Rule 272 (87 Ill. 2d R. 272). A party whose conduct contributes to or causes another to commit an irregularity in a judicial procedure cannot later use the irregularity to his advantage. See *In re Rauch* (1977), 45 Ill. App. 3d 784, 359 N.E.2d 894.

In *Schmidt v. Cenacle Convent* (1967), 86 Ill. App. 2d 150, 229 N.E.2d 413, *appeal denied* (1968), 37 Ill. 2d 626, the appellate court held, in circumstances very similar to this case, that the plaintiff was estopped from challenging the timeliness of the defendant's post-trial motion. The jury verdict had been returned and judgment entered on June 30. On July 1, plaintiff mailed a judgment order to the court requesting that it be entered. The court entered the order on July 6. Defendant ascertained this date and filed its post-trial motion within 30 days thereafter. The appellate court held that even though the plaintiff had not intended to mislead the defendant, the written judgment order had that effect.

> "Without impugning the motives of anyone, we hold that plaintiff must be estopped to assert any date other than July 6, 1966, as the effective date of the judgment." 86 Ill. App. 2d at 157.

■ We therefore conclude that the plaintiff is estopped from challenging this appeal based upon timeliness because the written order had the unintentional effect of misleading defendant.

### DEFENDANT'S APPEAL

On May 14, 1980, plaintiff instituted this action for damages against defendant. Plaintiff's second amended complaint alleged that on November 25, 1979, defendant owned and operated a bus service as a common carrier for hire. On that date plaintiff was a fare-paying passenger. The complaint further alleged that the defendant owed plaintiff the highest duty of care and violated that duty when its driver negligently caused the bus to crash into a cement abutment, that plaintiff sustained serious and permanent personal injuries as a direct and proximate result of defendant's violation of its duty and that defendant is liable to plaintiff for damages.

Defendant's answer to plaintiff's complaint, filed June 30, 1980, admitted that it owned and operated the bus involved in the collision and denied all other allegations, including those of negligence, causation and damages.

Approximately 8½ years after plaintiff initiated this action, the case was called for trial. On the eve of trial, defendant admitted negligence but continued to deny that plaintiff's condition of ill-being was proximately caused by the accident of November 25, 1979.

With this admission of negligence, it is undisputed that plaintiff would be entitled to, at least, nominal damages. Plaintiff became afflicted with inflammatory pneumonitis, a restrictive lung disease involving the progressive destruction of lung capacity and right heart

failure. This resulted in severe and permanent physical disability and substantial reduction of plaintiff's life span. The principal issue at trial was the causal connection between this condition and the accident for which defendant accepts responsibility.

To support his case, plaintiff presented evidence to show that he was exposed to a dangerous amount of diesel fuel at the scene of the accident. Then plaintiff presented evidence of medical symptoms which appeared from the time of the accident up to the time that he testified at trial. His treating physicians, who are also admitted medical experts, testified that there is a causal connection between plaintiff's condition and the accident.

During trial, defendant sought to discredit plaintiff by confronting him with statements that plaintiff allegedly made to a medical intern at Michael Reese Hospital in February of 1980. Plaintiff denied making such statements and indignantly stated that if the intern worked for him, he would have discharged the intern. Having set the foundation for impeachment, defendant failed to follow through. Defendant did not offer the testimony of the intern and did not offer any medical records allegedly prepared by that intern.

Except for attempts to use the unadmitted references to the Michael Reese records, defendant did not seriously challenge the expert medical testimony of plaintiff's witnesses. The defense did not offer any expert medical evidence to contradict the evidence offered by plaintiff. The only witness presented by the defense was Elsworth Cobble, a paramedic who arrived at the scene shortly after the accident. Defendant also attempted to obtain a continuance to produce a witness who was not included on defendant's witness list. Defendant's request was denied.

To place this appeal in proper perspective, a brief review of the evidence is appropriate.

Plaintiff testified that he was born in Ghana in 1938 and was one of two students in the entire country selected on the basis of an annual competitive examination to study abroad on a Commonwealth Scholarship. Plaintiff was sent to Dalhousie Medical School, Canada, where he received an M.D. degree in 1967 and a master's degree in biochemistry. In 1971, plaintiff went to Yale University, New Haven, Connecticut, where he received training in pediatric gastroenterology and received the top prize for research. Plaintiff is board certified in internal medicine and gastroenterology and licensed to practice medicine in Illinois, California and Nova Scotia, Canada.

In May 1979, plaintiff presented a scientific paper at an international medical meeting in New Orleans. Dr. Leonidas Berry heard

plaintiff's presentation and invited plaintiff to interview for the position of head of the department of gastroenterology at Cook County Hospital, Chicago, Illinois.

After a number of interviews with the hospital's administrative and department heads, plaintiff accepted the position. On the evening of November 25, 1979, at approximately 8:30 p.m., plaintiff arrived at O'Hare Airport, Chicago, to commence his job as department head of Cook County Hospital the following day. Plaintiff paid his fare and boarded defendant's bus, which proceeded along the Kennedy Expressway toward the Chicago Loop. The pavement on the expressway was wet and slippery, due to freezing rain. Defendant's bus was travelling at an excessive speed, fishtailed, careened into a cement abutment and came to a dead stop.

Other witnesses testified that the bus was damaged so severely that it was not repaired, but was declared a total loss by defendant.

Defendant's bus holds 60 gallons of diesel fuel No. 2. The bus' engine is mounted in the rear, and the diesel fuel tank is located in front of the engine. The diesel fuel tank is connected to the engine by two 4½-foot-long flexible lines. The fuel is pumped into the engine by a fuel pump. As a result of the impact, the bus' engine shifted and these fuel lines were completely severed at the point where they attach to the engine. The fuel tank ruptured and diesel fuel spilled from it. The bus' engine continued to run following the crash.

After the impact, there was complete pandemonium inside the bus. Passengers could be heard crying and screaming. Elsworth Cobble, a paramedic who arrived at the scene after the accident, testified that, although he himself did not smell diesel fuel inside the bus, when he first entered the bus an unidentified passenger came up the aisle saying, "My face is burning, my face is burning." Elaine Knoth, a passenger on the bus, testified that immediately after the crash there was a "very strong" smell of diesel fuel inside the passenger compartment, and someone yelled "Oh, my God, I smell gas!" Ms. Knoth climbed out of an emergency window of the bus and observed a puddle of diesel fuel on the ground "underneath the rear of the bus [where] it was spilling out." The puddle of diesel fuel extended out from under the side and rear of the bus. At first Ms. Knoth was able to climb out the window of the bus without stepping in the puddle, but the puddle got larger and, later, she could not walk to the rear of the bus without stepping around the puddle.

Defendant's superintendent of maintenance, Edward Vanderheyden, was called by the plaintiff as a witness and testified that he smelled diesel fuel when he arrived at the bus about 1½ hours af-

ter the accident. In the interim, the bus had been towed to an off-ramp some distance from the scene of the accident. When Mr. Vanderheyden was inspecting the bus for damage, diesel fuel was still coming from underneath the bus and there was a puddle of diesel fuel mixed with rain that was approximately two inches deep. Mr. Vanderheyden testified that his shoes got so saturated with diesel fuel during his inspection of the bus that he had to throw them away when he got home that night.

Like Ms. Knoth, plaintiff also climbed out of the bus' emergency window. Plaintiff stood for a time next to the window, aiding the other passengers climbing out of the bus. Thereafter, plaintiff testified that he walked to the front of the bus, stood for awhile on the embankment, and then walked back to the rear of the bus to help more passengers climb out. While standing at the rear of the bus, plaintiff noticed the heavy smell of diesel on himself. His hands were covered with diesel as if he had dipped them in it. His face and lips were covered with diesel and he had diesel fuel in his mouth. Although plaintiff was wearing a parka, he testified that his hair and his suit were also covered with diesel. His shoes were wet and his socks were sticky. Plaintiff testified that it was as if he had jumped into a container of diesel fuel.

Plaintiff flagged down a passing motorist, Ms. Nunn, who drove him to the Karl Meyer Residence Hall of Cook County Hospital. Once at the residence hall, plaintiff called Dr. Berry, informed Dr. Berry that he was involved in an accident, and told Dr. Berry that he felt as if he was running a slight fever and was short of breath. Plaintiff then took two consecutive baths to remove the diesel fuel from his body. After taking the first bath, plaintiff noticed that the bathwater had turned black. While taking the second bath, plaintiff noticed that there were puddles of oil on the surface of the bathwater. Plaintiff went to bed feeling feverish and short of breath, with a slight cough that worsened during the night. These symptoms persisted the next day.

Mrs. Rose Pero, a friend of plaintiff, testified that she received a telephone call between 9 and 10 p.m. on November 25 from plaintiff, who asked her if she would bring his suit to the dry cleaners the following day. Mrs. Pero testified that plaintiff's suit was in a plastic bag, had dark spots on it that looked like grease, and smelled like petroleum.

On the morning of November 26, 1979, plaintiff was examined by Dr. Berry. At trial, Dr. Berry testified that he received his M.D. from Rush Medical School of the University of Chicago in 1930 and a mas-

ter's degree in pathology from Illinois Medical School in 1933. He has been involved in the private practice of internal medicine for 50 years and was an attending physician at Michael Reese Hospital, Cook County Hospital and Provident Hospital from 1963 to 1980. Dr. Berry is board certified in internal medicine and gastroenterology and specializes in the pathology of the lung. Dr. Berry is credited with inventing the first direct vision gastroscope.

Dr. Berry's initial examination of plaintiff indicated that he had a fever, a cough and shortness of breath. Plaintiff related to Dr. Berry the fact that he had been involved in a bus accident the night before and that he had been covered with diesel fuel.

Dr. Berry continued to treat plaintiff on a weekly basis. Dr. Berry testified that he had occasion to view X rays of plaintiff's chest taken after plaintiff was involved in a minor car accident on May 4, 1979, six months prior to the bus accident of November 25, 1979. These X rays showed that plaintiff's lungs were normal as of that date. Three days after the bus accident, on November 28, 1979, plaintiff had a chest X ray taken which disclosed the presence of fluid on his lungs and a slight inflammation. X rays taken of plaintiff's chest on January 23, 1980, disclosed increased inflammation of plaintiff's lungs. Another set of X rays, taken on February 11, 1980, showed increased inflammation of plaintiff's lungs, inflamed or blotted out air sacs and the beginnings of scar tissue. Dr. Berry testified that infiltrates in plaintiff's lung fields had occurred since the previous X rays were taken.

During the next few weeks following the accident, plaintiff lost 40 pounds, experienced shortness of breath even while at rest and could not walk across the room without coughing up phlegm.

Dr. Berry described plaintiff, prior to the bus accident, as being a very robust individual. Dr. Berry recalled that during plaintiff's initial interviewing visits to Cook County Hospital, plaintiff walked so fast that Dr. Berry had a difficult time keeping up with him.

When plaintiff's condition did not improve, Dr. Berry had him admitted into Michael Reese Hospital on February 21, 1980, for an open lung biopsy. The lung biopsy disclosed the presence of a considerable amount of fluid in plaintiff's lungs. The biopsy showed that there was an unusual "interstitial pneumonia with scarring secondary to this pneumonia." While at Michael Reese, plaintiff was placed on Prednisone, a cortisone preparation to relieve some of the side effects of his disease. Because Prednisone causes water retention, plaintiff was also placed on Lasix, a drug which removes excess fluid from the body.

Dr. Berry testified that it was his medical opinion that plaintiff

was suffering from a chemical pneumonia and pneumonitis, a restrictive injury to the lungs' air sacs, which destroyed 66% of his lung capacity. The injury to plaintiff's air sacs obstructed the passage of oxygen through the lung tissue into plaintiff's arterial blood system. Dr. Berry testified that it was his expert opinion, based upon a reasonable degree of medical certainty, that this condition is a direct result of plaintiff's exposure to diesel fuel after the bus accident of November 25, 1979. Dr. Berry further testified that a few teaspoons of diesel aspirated into the lungs was enough to cause this condition. Dr. Berry concluded that some of the diesel fuel on plaintiff's lips and in plaintiff's mouth was swallowed. The diesel fuel on plaintiff's body was absorbed through his skin and aspirated directly into his lungs. Dr. Berry testified that, on the basis of his frequent personal observations of plaintiff during the six-month period prior to the bus accident, the pre- and post-occurrence X rays, the laboratory tests, the lung biopsy, the clinical findings and the history which he and plaintiff's other treating doctors had taken, there was no way plaintiff's condition could have predated the bus accident.

While plaintiff was on the witness stand, defense counsel attempted to cross-examine him regarding a medical history purportedly given by plaintiff to an intern upon his admission to Michael Reese Hospital in February 1980. Defense counsel asked plaintiff whether he told the intern that he had been experiencing shortness of breath for six months, whether plaintiff first noted shortness of breath last summer vacationing at a national park in Nova Scotia, whether pulmonary restrictions further progressed in November 1979 as a result of a motor vehicle accident in which he inhaled diesel fumes and whether plaintiff had been exposed to a parakeet at the time of the onset of the illness. Plaintiff denied making any of these statements. Plaintiff then stated that, "If this intern worked for me, I would fire her, honestly."

During its case in chief, the defense did not follow through on this attempt to impeach plaintiff. Neither the intern nor any record prepared by the intern was presented to contradict plaintiff.

In the fall of 1980, plaintiff was referred for treatment to Dr. Richard Mark Cullen, a specialist in pulmonary chemical injuries. Dr. Cullen is a professor of medicine and pulmonary epidemiology at Yale University Medical School. Dr. Cullen graduated from Harvard University and received his M.D. from Yale University School of Medicine. Dr. Cullen is board certified in internal medicine, has reviewed the medical literature on the relationship of mineral oils to lung disease and has published 30 articles in medical journals on such subjects

as pulmonary injuries due to oil mist exposure. Dr. Cullen is well known for his research on the effects of diesel fuel and petroleum products on the lungs.

On October 15, 1980, Dr. Cullen performed a complete physical examination of plaintiff. Plaintiff told Dr. Cullen that he had been involved in a bus accident and had been exposed to diesel fuel. In addition to the physical examination, Dr. Cullen reviewed plaintiff's X rays, biopsy slides and laboratory studies and found bilateral scarring of plaintiff's lungs which had caused increased pressure in the right heart. Like Dr. Berry, Dr. Cullen testified that it was his medical opinion that plaintiff was suffering from inflammatory pneumonitis. Dr. Cullen stated "In retrospect, there can be little doubt about the cause of this crippling, nearly fatal disease. The suddenness of onset, the previously normal X-ray and the biopsy showing a uniform injury of a single age, prove that this illness was caused by a single onset which must have occurred just prior to the onset of his symptoms. The conclusion, inescapable, is that the illness was indeed caused by the toxic exposure to diesel oil during the motor vehicle accident which preceded its onset."

By 1981, plaintiff was experiencing increased shortness of breath, persistent coughing, frequent lung infections and swollen ankles and feet, which evidence congestive heart failure, and there was so little oxygen getting to plaintiff's tissues that his lips and eye conjunctiva had turned blue.

In March 1982, plaintiff was admitted to the intensive care unit at Mayo Clinic with partial failure of the right heart, caused by the scarring of plaintiff's lung tissue. This scarring also caused enlargement of plaintiff's liver, swelling and edema of plaintiff's feet and ankles to twice their normal size, high fever and lung function of 35% the normal rate.

At the Mayo Clinic, plaintiff was treated by Dr. Dennis Cortese. At trial, Dr. Cortese testified that he received his M.D. from Temple Medical School in 1970 and graduated from Mayo Graduate School of Medicine in 1972 with a specialty in internal medicine. Dr. Cortese was the director of the pulmonary disease training program at the Mayo Clinic from 1982 to 1987. Dr. Cortese is board certified in internal medicine and pulmonary diseases. Dr. Cortese testified that he has treated other patients who have had the same condition as plaintiff.

Dr. Cortese was informed of plaintiff's history regarding the bus accident and his exposure to diesel fuel. Plaintiff has been under the care of Dr. Cortese from this initial stay at the Mayo Clinic until the time of trial.

Plaintiff remained at the Mayo Clinic for a period of approximately three weeks. A biopsy of plaintiff's lung, taken on March 31, 1982, showed "chronic interstitial pneumonitis with moderate fibrosis and mild chronic inflammation." X rays taken of plaintiff's chest at that time showed enlargement of the heart, heart failure and pulmonary venous hypertension.

At trial, Dr. Cortese testified that the oxygen level in plaintiff's arteries while plaintiff is at rest is below the oxygen level in a normal person's veins and that the oxygen in plaintiff's arteries at exercise is what a normal person should have at rest. He testified that in September 1988, the most recent examination Dr. Cortese conducted on plaintiff prior to trial, plaintiff had the lowest arterial oxygen level both at rest and at exercise at any time since his initial exam in 1982.

Dr. Cortese testified, in his medical opinion, based upon a reasonable degree of medical certainty, that although interstitial pneumonitis may have many different causes, plaintiff's condition "is causally related to the exposure to the diesel fumes and hydrocarbons in that accident in '79."

All three of plaintiff's treating doctors testified that they did not think plaintiff's condition would improve. Plaintiff's lung condition, interstitial pneumonitis, had caused a terminal heart condition. The scarring of plaintiff's lung fields obstructs the passage of oxygen into plaintiff's blood, the low level of oxygen in plaintiff's blood increases the pressure on plaintiff's right heart, and this increased pressure causes right heart failure. When the heart begins to fail, venous blood coming into the heart cannot be pumped out and the lack of oxygen results in the death of the cells of the heart muscle.

Plaintiff's continued existence required that he have supplemental oxygen eight hours each night as well as during the day to prevent complete heart failure. The overworking of plaintiff's heart would require him to take supplemental oxygen for the rest of his life. Both Drs. Berry and Cullen testified that, in their medical opinions, the complication of heart failure resulting from plaintiff's condition would eventually kill plaintiff. Plaintiff's condition is irreversible.

The drug, Prednisone, which plaintiff had taken since March 1980, caused plaintiff to develop diabetes. Lasix, which plaintiff took to reduce the water retention caused by Prednisone, had resulted in plaintiff's loss of bladder control, and caused him to urinate in his pants as often as two or three times per week.

Dr. Berry, who was plaintiff's original treating physician, professional colleague and the person who recruited him to accept the Cook County Hospital position, also testified that plaintiff had

"exceptional skills and ability and a great future, not only as a doctor, but a man of unusual capacity, compassion \*\*\*. If he were a man with European ancestry, he would be of the stature of Albert Schweitzer."

The physical requirements placed on a gastroenterologist while performing a gastroscopy are many. For this reason and because of the risk involved to both doctor and patient during a gastroscopy, plaintiff engaged in private practice as a gastroenterologist for the last time on November 25, 1979, the day of the bus accident. Plaintiff engaged in the private practice of medicine from 1972 until the bus accident and earned $200,000 per year during the two years prior to the accident.

Plaintiff's employment contract with Cook County Hospital provided that plaintiff would be a senior physician and could engage in private practice in addition to his administrative duties. Plaintiff's salary as chief of the department of gastroenterology at Cook County Hospital, which was initially $58,000, increased to $85,000 by December 1982, and took into account that he could also engage in private practice.

In December 1982, plaintiff began employment at UCLA Medical Center, Los Angeles, California, and earned a salary of $100,000 per year. One year later, he became acting chief of gastroenterology and earned the same salary. Plaintiff's duties at UCLA Medical Center were entirely administrative, with no responsibility for patients, procedures and research. Plaintiff earned an additional $50,000 in 1986 and 1987 as a consultant. However, in 1988, plaintiff earned only an insignificant amount acting as a consultant.

Plaintiff testified that he had personal knowledge of the salary range of gastroenterologists at the time of trial in Los Angeles and other areas of the country. He testified that the salary for gastroenterologists in Los Angeles ranged from $150,000 for a doctor who has just finished training to $400,000 to $500,000 for a doctor who has practiced gastroenterology for 10 to 15 years.

At the close of the trial, the jury returned a verdict in favor of plaintiff, assessing plaintiff's damages in the amount of $7,746,200. The trial court entered judgment on the verdict and denied defendant's motion for a judgment notwithstanding the verdict.

I

Defendant's principal argument on appeal is that the trial court committed reversible error by denying defendant's motion for judgment notwithstanding the verdict.

■ The standard of review for denial of a motion for judgment notwithstanding the verdict is well established. A judgment notwithstanding the verdict can only be granted where all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.

Defendant's threshold argument is that plaintiff failed to present evidence to explain how he was exposed to enough diesel fuel to justify the jury's conclusion that plaintiff developed inflammatory pneumonitis as a result of the bus accident of November 25, 1979.

■ Applying the *Pedrick* standard, after a careful review of the evidence, we conclude that the trial court correctly denied defendant's motion for judgment notwithstanding the verdict.

Defendant's theory is that plaintiff, as a medical expert, sought to take advantage of the accident to blame defendant for his medical condition. This argument must fail because there is sufficient evidence to demonstrate the total destruction of the bus, the rupture of the 60-gallon diesel fuel tank, the spilling of diesel fuel and plaintiff's exposure to the fuel.

Plaintiff's symptoms commenced on the evening of the accident and continued uninterrupted to the time of trial. His prior robust physical condition is undeniable. His loss of 40 pounds within weeks of the accident is not contradicted. His preaccident and post-accident X rays corroborate the causal connection between the accident and plaintiff's condition of ill being. Plaintiff sought and obtained the best medical treatment in an effort to be cured and prolong his useful life and promising career.

Defendant's attempt to portray plaintiff as an opportunist who really wasn't exposed to diesel fuel was heard by the jury and not accepted. The jury was properly instructed on causation and followed the instructions.

In addition, the defense sought to portray an alliance between plaintiff and Dr. Berry to diminish the credibility of both and support defendant's attempt to show that there was no medical causation. The jury heard this argument and rejected it. Plaintiff's other treating physicians, like Dr. Berry, had unimpeachable professional credentials. Their testimony remained uncontradicted.

Defendant's strongest attempt to establish lack of causation was the failed attempt at impeachment of plaintiff. *Ramseyer v. Illinois Central R.R. Co.* (1969), 110 Ill. App. 2d 95, 98, 249 N.E.2d 120.

The *Pedrick* standard makes it difficult for defendant to meet its

burden to set aside plaintiff's verdict. After a careful review of the evidence, we conclude that defendant failed to meet its burden. Therefore, the trial court did not err when it denied defendant's motion for judgment notwithstanding the verdict.

## II

Next, defendant argues that if its motion for judgment notwithstanding the verdict is denied, it is entitled to a new trial because the damages awarded to plaintiff are excessive and the result of sympathy and prejudice. We disagree.

The jury was given a general verdict form which it returned. Defendant did not object to the general verdict form, did not tender any alternate special verdict form and did not submit any special interrogatories to the jury.

■■ ■ The court does not have a duty to submit separate forms of verdict, but, rather, a party must make a motion for the court to direct the jury to find separate verdicts, and a party who fails to do so waives its right to object on appeal regarding such an omission. (*Beccue v. Rockford Park District* (1968), 94 Ill. App. 2d 179, 196, 236 N.E.2d 105, *appeal denied* (1969), 39 Ill. 2d 625.) Where there is a general verdict, and more than one theory has been presented, the verdict will be upheld if there was sufficient evidence to sustain any one theory. See *Witherell v. Weimer* (1987), 118 Ill. 2d 321, 329, 51 N.E.2d 68; *Stark v. D & F Paving Co.* (1977), 55 Ill. App. 3d 921, 928, 371 N.E.2d 315.

■ The test of whether a verdict is excessive is whether the total amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. *King v. City of Chicago* (1978), 66 Ill. App. 3d 356, 359, 384 N.E.2d 22.

Plaintiff was an enormously gifted and talented individual who overcame considerable obstacles to obtain an excellent education. His professional career was marked with successive impressive accomplishments. He was vigorously recruited for the important position at Cook County Hospital, which he was about to undertake when the accident occurred.

He was young, physically robust and on the threshold of unlimited professional success. He was deprived of his physical vitality, unable to pursue his profession and unable to enjoy an existence free of pain and physical disability. His earning capacity was substantially diminished.

■ It is not necessary to repeat the details of the evidence deal-

ing with the specific elements of damages suffered by plaintiff. They have been sufficiently detailed elsewhere in this opinion. The verdict of the jury awarding plaintiff damages in the sum of $7,746,200 is reasonable under the facts of this case and is not so large as to "shock the judicial conscience."

Defendant's argument about plaintiff's improper use of charts and reference to plaintiff's reduced life span, even if correct, are not of such a nature as to overcome the substantial evidence of damages suffered by plaintiff.

We therefore conclude that, based upon the record, the verdict is proper.

## III

Defendant's final assignment of error is that the court abused its discretion in denying its motion for a continuance to present the testimony of Ms. Nunn, the passing motorist who drove plaintiff to the residence hall on the night of the bus accident.

■ To determine whether the trial court abused its discretion, a reviewing court must balance the interest in the prompt disposition of cases with the equally compelling interest in attaining justice. *Jack v. Pugeda* (1989), 184 Ill. App. 3d 66, 539 N.E.2d 1328, *appeal denied* (1989), 127 Ill. 2d 617.

■ Through discovery, defendant had been aware of Ms. Nunn's status as a post-occurrence witness since 1980. Although aware of her existence for 8½ years, defendant did not interview Ms. Nunn, nor take her deposition. In response to interrogatories filed three days before trial, defendant did not list Ms. Nunn as one of its witnesses. At trial, defendant informed the court that the only testimony it was going to present was the deposition transcript of Elsworth Cobble, the paramedic. It was only on the sixth and final day of trial that defendant first attempted to secure the appearance of Ms. Nunn as a defense witness. Based upon these facts, we conclude that the trial court did not abuse its discretion in denying defendant's motion for a continuance to present the testimony of Ms. Nunn.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.